UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

    v.

PHILLIP R. BENNETT,

        Defendant.

08 CV 1631

ECF CASE

FEB 1 9 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Commission"), alleges as follows:

### SUMMARY

1.    From at least 1998 to October 2005, Phillip R. Bennett ("Bennett") orchestrated a disclosure fraud that ultimately led to the demise of Refco Inc. Bennett was the company's chairman and chief executive officer. The core of the fraud was a scheme that periodically concealed hundreds of millions of dollars owed to Refco Inc. and its corporate predecessor Refco Group Ltd. by a non-Refco entity that Bennett controlled. (Refco Inc. and Refco Group Ltd. are hereinafter referred to as "Refco"). The fraud also utilized certain practices that inflated Refco's reported financial results.

2.    The debt was concealed by a series of short-term loans that temporarily transferred the debt to third parties immediately prior to the end of a Refco fiscal period. A few days after the

fiscal period ended, the transactions were reversed, and the debt was transferred back to the Bennett-controlled entity.

3. The period-end transactions were carried out and implemented at Bennett's direction. He regularly participated in meetings in which the transactions were discussed and planned. He executed many of the documents involved in the transactions. Bennett undertook those actions with an eye towards selling Refco.

4. In furtherance of the goal of making Refco more attractive to potential investors, Bennett also instituted practices that artificially enhanced Refco's financial results. These practices involved Refco recording fictitious interest income and income from fictitious foreign exchange trades.

5. In August 2004, Refco privately placed $600 million of senior subordinated notes, in connection with a leveraged recapitalization. Refco subsequently exchanged those notes for $600 million in notes registered with the Commission pursuant to a registration statement declared effective in April 2005. By virtue of that registration, Refco was required to file certain information and reports with the Commission. Accordingly, in July 2005, Refco filed an annual Report on Form 10-K and a quarterly Report on Form 10-Q. Refco later conducted an initial public offering of common stock registered pursuant to a registration statement filed with the Commission and declared effective in August 2005. Bennett signed the registration statements, the annual report, and the quarterly report. Furthermore, he explicitly certified statements contained in the annual report and quarterly report. Neither the registration statements nor the annual report disclosed the period-end transactions involving the Bennett-controlled entity, though disclosure was required by the federal securities laws. Moreover, the financial statements in the registration statements, the annual

report, and the quarterly report contained additional material misstatements or omissions related to the debt.

6. By engaging in this conduct, Bennett violated the antifraud, falsification of records, and certification provisions of the federal securities laws, and he aided and abetted Refco's violations of the periodic reporting, books and records, and internal controls provisions. The Commission requests, among other things, that this Court permanently restrain and enjoin Bennett from further violations of the federal securities laws as alleged in this Complaint, order that he disgorge all unjust enrichment from his unlawful conduct, including prejudgment interest thereon, and pay monetary penalties. The Commission also requests that this Court issue an order pursuant to Section 20(e) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(2)] prohibiting Bennett from acting as an officer or a director of a public company.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. Bennett, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9. Certain of the acts, practices, and courses of conduct constituting the violations of law alleged herein occurred within this judicial district.

10. Bennett, directly and indirectly, has engaged in, and unless restrained and enjoined by this Court will continue to engage in the acts, practices, and courses of business alleged herein, or in acts, practices, and courses of business of similar purport and object.

## DEFENDANT

11. Phillip R. Bennett, 59, resides in Gladstone, New Jersey. He joined Refco Inc.'s predecessor, Refco Group Ltd., in 1981. Beginning in September 1998, Bennett was chief executive officer and president of Refco Group Ltd., and chairman of its board of members. After Refco's August 2005 initial public offering of common stock, Bennett was chief executive officer and chairman of the board of directors of Refco Inc. On October 10, 2005, Refco placed Bennett on an indefinite leave of absence. Bennett resigned from Refco in January 2006.

## RELEVANT ENTITIES

12. Refco Group Ltd. was a Delaware limited liability company with its headquarters in New York City. The company was a major provider of execution and clearing services for exchange-traded derivatives and of prime brokerage services in the fixed income and foreign exchange markets. It held regulated commodities and securities brokerages. As part of a reincorporation conducted in preparation for its August 10, 2005, initial public offering of common stock, Refco Inc. became the corporate successor to Refco Group Ltd. After the offering, Refco's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78*l*(b)] and traded on the New York Stock Exchange. Press reports regarding the Bennett-entity debt and its periodic concealment began to appear on October 10, 2005. On October 13, 2005, the New York Stock Exchange halted trading in Refco's common stock, and on October 17, 2005, Refco filed for protection under Chapter 11 of the U.S. Bankruptcy Code.

On October 18, 2005, Refco's common stock was delisted. Refco's shareholders consequently lost hundreds of millions of dollars. Refco's fiscal year ended at the end of February.

13.  Refco Group Holdings, Inc. ("RGHI") is a closely held Delaware corporation. It is the Bennett-controlled entity that owed Refco debts concealed over period-ends. It is not, and was not, a subsidiary of Refco. At all relevant times for this Complaint, Bennett owned a substantial interest in RGHI. From approximately August 1999 to August 2004, Bennett owned 50 percent of RGHI. Subsequent to August 2004, Bennett completely owned RGHI. At all relevant times for this Complaint, RGHI held a substantial ownership interest in Refco.

## FACTS

### Concealment of Related Party Transactions

14.  Beginning in the mid-1990's, Refco assumed significant trading losses incurred by customers to whom it had extended credit. During this time, Refco also incurred significant losses resulting from proprietary trading. Over time, the combined customer and proprietary trading losses came to aggregate several hundred million dollars. Eventually, in order to move the losses off of Refco's books, Bennett directed that they be transferred to RGHI, the Bennett-controlled entity. As a result, Refco held receivables from RGHI for hundreds of millions of dollars. Because of Bennett's executive positions at Refco and his ownership interest in Refco through RGHI, these transfers and the resulting receivables were related party transactions. Over time, the receivables came to include certain Refco operating expenses that were transferred to RGHI as well as the putative accumulated interest owed to Refco on the receivables.

15. The amount of the RGHI receivables fluctuated over time, growing at one point to more than $1 billion. In February 2005, just prior to the end of Refco's fiscal year, the aggregate total of the receivables was approximately $525 million, and in August 2005, just prior to the end of Refco's second fiscal quarter, it was approximately $495 million.

16. Beginning in at least 1998, Refco, at Bennett's direction, began engaging in a series of short-term transactions that temporarily shifted the receivables from RGHI to third parties at the end of a Refco fiscal period. From February 1998 to February 2004, these transactions were implemented at the end of each of Refco's fiscal years. Beginning in May 2004, these transactions occurred at the end of each fiscal quarter as well.

17. In these transactions, Refco Capital Markets, Ltd. ("RCM"), an offshore Refco subsidiary involved in derivatives and foreign exchange trading, made a loan to a third party in the days before the end of a Refco fiscal period. The third party, in turn, made a loan to RGHI in the same amount. RGHI then used the loan to pay down the receivables it owed Refco. Therefore, at the fiscal period-end, instead of a receivable from RGHI, Refco's books showed a receivable from a third party in the amount of the original loan.

18. As part of these transactions, Refco provided the third party with a guaranty against a default by RGHI. Refco also provided the third party with an indemnification for any claims arising out of the loans. (The loan that the third party made to RGHI carried a higher interest rate than the loan that RCM made to the third party. Thus, the transactions posed no economic risk to the third party and assured it of a profit from them.)

19. A few days after the Refco fiscal period-end, the transactions were reversed, and the receivable owed to Refco by the third party shifted back to RGHI. In most instances, these

transactions were accomplished solely through bookkeeping entries, and the only cash exchanged was the payment to the third party for the interest rate differential that made the loans profitable. The transactions lacked any legitimate business purpose and were designed solely to conceal the RGHI receivables at the ends of Refco fiscal periods.

20. The third parties participating in these transactions were often hedge fund clients of Refco. Over the course of the scheme, various third parties participated and, in some instances, the receivables were divided among and transferred to multiple third parties over a single period-end. From February 2000 through February 2005, Bank für Arbeit und Wirtschaft ("BAWAG"), an Austrian bank, participated in similar transactions concealing the RGHI receivables over Refco's fiscal year-ends.

21. Bennett orchestrated the period-end transactions. The transactions were carried out and implemented at his direction. Bennett participated in meetings in which the transactions were discussed and at which the requisite size of the transactions was determined. On behalf of Refco, Bennett signed the letters of guaranty and indemnification that Refco provided the third parties protecting them from a default by RGHI as well as from any claims arising out of the transactions. Bennett also executed, on behalf of RGHI, the agreements for the loans that RGHI received from the third parties in the transactions.

22. Bennett also orchestrated the fiscal year-end transactions involving BAWAG. On several occasions, he discussed the transactions directly with BAWAG executives. In certain instances, Bennett signed internal Refco documentation authorizing wire transfers that were part of these transactions. In February 2003, Bennett signed a letter that was provided to BAWAG

stating that certain Refco funds on deposit at the bank could be retained by BAWAG should RGHI default on its loan repayment obligations.

23. An example of the period-end transactions is provided by those that occurred over Refco's May 31, 2005, fiscal quarter-end. Those transactions temporarily shifted $450 million of RGHI receivables to a third party. Thus, on or about May 25, 2005, RCM loaned $450 million to a third party. At the same time, the third party loaned $450 million to RGHI. The interest rate on that loan was 75 basis points higher than the interest rate on the loan from RCM to the third party. Bennett executed the agreement for the loan that RGHI received from the third party. Finally, Refco provided the third party with a guaranty against a default by RGHI and an indemnification for any claims arising out of the loans. Bennett executed the guaranty and the indemnification.

24. RGHI used the May 25 loan from the third party to pay down the receivables it owed to Refco. Thus, Refco's fiscal quarter-end financial statements showed a receivable from the third party rather than receivables from RGHI. On or about June 6, 2005, after the quarter-end, the transactions were reversed, and the receivables shifted back to RGHI.

### Inflation of Refco's Financial Results

25. While the chief executive officer of Refco, Bennett contemplated selling the company to an investment group or entity, and perhaps ultimately taking Refco public. To make Refco more attractive to potential investors, Bennett also orchestrated practices that artificially inflated Refco's reported financial results.

26. Bennett regularly set aggressive internal projections for Refco's financial performance. At Refco, he received a daily report that compared the company's actual

performance to the internal earnings forecast. He met quarterly with another senior executive to determine whether Refco's results needed to be adjusted to eliminate any shortfalls in budgeted earnings. In some periods when Refco's actual performance was less than its forecast, Bennett directed that certain practices be carried out to inflate Refco's results.

27.  One such practice involved fictitious interest income, purportedly due Refco from the RGHI receivables. Since at least 1998, interest on the RGHI receivables had been manipulated for the purpose of improving Refco's results. For example, on or about February 11, 2005, interest "due" Refco from the RGHI receivables was arbitrarily increased, at Bennett's direction, by $12 million in order to eliminate a shortfall in projected earnings. The adjustment increased Refco's revenue by $12 million, while RGHI's debt to Refco increased by an identical amount.

28.  A second practice involved the utilization of fictitious foreign exchange transactions between RGHI and RCM, the Refco subsidiary. In these transactions, entries were recorded purportedly showing that RGHI had "purchased" a foreign currency from RCM at the currency's highest price for the day and then "sold" the currency back to RCM at the currency's lowest price for the day. The sham currency trades resulted in gains for RCM, while RGHI recorded the losses. For example, at Bennett's direction, on or about February 17, 2005, approximately thirty-two fictitious foreign exchange transactions involving Euros, British pounds, Swiss franks, and Japanese yen were recorded between RGHI and RCM. These transactions resulted in Refco recognizing $5 million in revenue, while RGHI recorded a $5 million loss. Similar fictitious foreign exchange transactions were carried out in August 2004, October 2004, and November 2004.

**False and Misleading Filings**

29.     In August 2004, Thomas H. Lee Partners, L.P. and its affiliates and co-investors acquired approximately 57 percent of Refco, pursuant to a leveraged recapitalization. To fund the recapitalization, Refco issued a private offering circular placing $600 million of senior subordinated notes. Refco subsequently exchanged the notes for senior subordinated notes registered pursuant to a Registration Statement on Form S-4 that the Commission declared effective on April 8, 2005. The registration of the notes required Refco to file certain information and reports with the Commission. On July 1, 2005, Refco filed an annual Report on Form 10-K for its fiscal year ended February 28, 2005, and on July 15, 2005, it filed a quarterly Report on Form 10-Q for its fiscal quarter ended May 31, 2005. Refco subsequently commenced the initial public offering of its common stock pursuant to a Registration Statement on Form S-1 that the Commission declared effective on August 10, 2005. The discovery of the Refco disclosure fraud occurred prior to the filing deadline for any periodic reports required by the public issuance of Refco common stock.

30.     Pursuant to the federal securities laws, Refco was required to disclose as related party transactions in its registration statements: the RGHI receivables, the transactions moving the receivables from RGHI over the fiscal period-ends, the transactions returning the receivables to RGHI after the fiscal period-ends, and Refco's guaranties and indemnifications of the third-party loans to RGHI during its fiscal years ended February 28, 2003; February 29, 2004; and February 28, 2005. The annual report was required to disclose those receivables, transactions, guaranties, and indemnifications for Refco's fiscal year ended February 28, 2005. The

registration statements and the annual report failed to make these requisite disclosures. Accordingly, the registration statements and the annual report contained material omissions.

31.    The financial statements in Refco's registration statements, annual report, and quarterly report contained additional material misstatements or omissions relating to the receivables. For example, the financial statements included a line item for "receivables from equity members." For Refco's fiscal year ended February 28, 2005, and its fiscal quarter ended May 31, 2005, the filings showed a zero balance for the "receivables from equity members" line item, despite the fact that, at those period-ends, Refco had engaged in transactions that temporarily moved hundreds of millions of dollars of RGHI receivables to third parties. Showing a zero balance for receivables from equity members as of those period-ends failed to reflect the economic realities concerning the RGHI receivables.

32.    Moreover, generally accepted accounting principles required Refco to disclose material related party transactions in the financial statements contained in its registration statements, annual report, and quarterly report. The notes to the financial statements in these filings did not accurately disclose the existence of the RGHI receivables or quantify their amount. Moreover, the notes to the financial statements did not disclose the transactions moving the receivables from RGHI over the fiscal period-ends, the transactions returning the receivables to RGHI after the fiscal period-ends, and Refco's guaranties and indemnifications of the third-party loans to RGHI.

33.    Refco's registration statements, annual report, and quarterly report also materially misstated members' equity. The RGHI receivables derived largely from cumulative bad debt and trading losses that had not properly flowed through Refco's income statement as period

losses and, therefore, had not impacted members' equity. Instead of recording the receivables in the equity portion of its balance sheet as an obligation owed by Bennett, which would have lowered "members' equity" by a like amount, Refco recorded the receivables as "receivables from customers," thereby significantly overstating the amount of members' equity it reported. For example, proper treatment of the RGHI receivables would have resulted in members' equity of approximately negative $375 million as of February 28, 2005, rather than the positive balance of approximately $150 million that Refco falsely reported in its annual report and in its Registration Statement on Form S-1.

34.     Finally, as a result of fictitious interest income and sham foreign exchange trading income, Refco materially misstated the revenue and income that it reported in its Registration Statement on Form S-1 and in its annual report for its fiscal year ended February 28, 2005.

35.     Accordingly, the registration statements, the annual report, and the quarterly report that Refco filed with the Commission were false and misleading, in violation of the federal securities laws.

36.     During the time that he was directing and participating in the period-end transactions, Bennett signed Refco's registration statements, annual report, and quarterly report knowing, or reckless in not knowing, that those filings contained material misstatements and omissions.

37.     In addition, Bennett signed certifications for the annual report and the quarterly report stating that he had reviewed each report and that the reports contained no material misstatements or omissions and that the financial statements in the reports fairly presented in all material respects the financial condition and results of operations of the company. At the time he

signed those certifications, Bennett knew that those reports contained material misstatements and omissions and that the financial statements in the reports were not accurate. The certifications that Bennett signed and included in the annual report and the quarterly report also stated that Refco's management had designed adequate disclosure controls, and that management had disclosed "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrants' internal control over financial reporting." At the time he signed those certifications, Bennett knew, or should have known, that Refco's disclosure controls were not adequate and that fraud involving Refco management had not been disclosed.

38.     By directing and participating in the period-end transactions, Bennett knowingly caused false entries to be made on the books and records of Refco. Moreover, in order to hide the transactions, Bennett structured Refco's internal organization and transactions in a manner that ensured Refco's failure to devise and maintain a sufficient system of internal accounting controls. For example, when Refco needed to create an internal audit function as part of its preparation for becoming a public company, Bennett designated as the head of internal audit an individual who was beholden to him. Bennett knew that this designated internal audit head had maintained RGHI's financial records and was conversant with several aspects of the period-end transactions.

39.     As part of Refco's August 2005 initial public offering of its common stock, Bennett sold part of his equity interest in Refco, at a time when he was well aware of the Refco disclosure fraud, but investors were not. Bennett received tens of millions of dollars in unjust enrichment as a result. Bennett was also unjustly enriched by additional payments and monies he received as a result of the fraud, including but not limited to his $34.6 million share of an

$82.2 million dividend approved by Refco's board, and paid to Refco's pre-public offering owners, at the conclusion of the initial public offering of common stock but prior to public disclosure of the fraud.

## FIRST CLAIM FOR RELIEF

### FRAUD

**Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

40. Paragraphs 1 through 39 are realleged and incorporated herein by reference.

41. As set forth above, Bennett, directly or indirectly, acting knowingly or recklessly, by use of the means or instrumentalities of interstate commerce, or by the use of the mails or of the facilities of a national securities exchange, in connection with the offer, purchase, or sale of securities has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of an untrue statement of a material fact or an omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

42. By reason of the foregoing, Bennett violated Section 17(a) of the Securities Act [15 U.S.C § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## **SECOND CLAIM FOR RELIEF**

### REPORTING VIOLATIONS

**Violations of Exchange Act Rule 15d-14 [17 C.F.R. § 240.15d-14]
and Aiding and Abetting Violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]
and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13]**

43.     Paragraphs 1 through 39 are realleged and incorporated herein by reference.

44.     Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and rules promulgated thereunder require that a registrant with a registration statement declared effective pursuant to the Securities Act, but which does not have a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*], file with the Commission certain information, documents, and reports that accurately reflect the registrant's financial performance and provide other information to the public.

45.     Exchange Act Rule 15d-14 [17 C.F.R. § 240.15d-14] provides that the issuer's principal executive officer sign a certification attesting to, among other things, the accuracy of the disclosure and financial information in the reports filed pursuant to Section 15(d).

46.     As a consequence of Bennett's misconduct, Refco's annual Report on Form 10-K for its fiscal year ended February 28, 2005, and its quarterly Report on Form 10-Q for its fiscal quarter ended May 31, 2005, violated Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13]. As set forth above, Bennett signed certifications included in the annual report and quarterly report regarding the disclosures and financial statements in the reports, while knowing that the disclosures and financial statements were false and misleading. As set forth above, Bennett also signed certifications included in the annual report and quarterly report regarding disclosure controls and disclosure of

management fraud, when he knew, or should have known, that the disclosure controls were inadequate and that management fraud had not been disclosed.

47.  By reason of the foregoing, Bennett violated Exchange Act Rule 15d-14 [17 C.F.R. § 240.15d-14].

48.  Bennett knowingly, or recklessly, provided substantial assistance to Refco in its violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13].

49.  By reason of the foregoing, Bennett aided and abetting Refco's violations of Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. § 240.15d-2 and 240.15d-13].

## THIRD CLAIM FOR RELIEF

### RECORDKEEPING VIOLATIONS

**Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]
and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]
and Aiding and Abetting Violations of Section 13(b)(2)(A) and (b)(2)(B)
of the Exchange Act [15 U.S.C. § 78m(b)(2)(A), (b)(2)(B)]**

50.  Paragraphs 1 through 39 are realleged and incorporated herein by reference.

51.  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers who are required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets.  Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers who are required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that, among other things,

transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain the accountability of assets. Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] provides that no person shall knowingly falsify any book, record, or account described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1] prohibits the falsification, directly or indirectly, of any such book, record, or account.

52. As a consequence of Bennett's conduct, as set forth above, Refco's books, records, and accounts were falsified in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and Refco failed to devise and maintain a sufficient system of internal accounting controls as required by Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]. As set forth above, Bennett knowingly falsified Refco's books, records, and accounts.

53. By reason of the foregoing, Bennett violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

54. Bennett knowingly, or recklessly, provided substantial assistance to Refco in its violations of Section 13(b)(2)(A) and (b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A), (b)(2)(B)].

55. By reason of the foregoing, Bennett aided and abetted Refco's violations of Section 13(b)(2)(A) and (b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A), (b)(2)(B)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.  Permanently restraining and enjoining Bennett from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Exchange Act Rules 10b-5, 13b2-1, and 15d-14 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.15d-14], and from aiding and abetting violations of Sections 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), and 78o(d)] and Exchange Act Rules 15d-2 and 15d-13 [17 C.F.R. §§ 240.15d-2 and 240.15d-13];

B.  Ordering Bennett to disgorge all his unjust enrichment, with pre-judgment interest thereon, that he received as a result of his misconduct alleged in this Complaint.

C.  Ordering Bennett to pay civil money penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

D.  Prohibiting Bennett, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

E.  Granting such other relief as this Court may deem just and appropriate.

Dated: Washington, D.C.
       New York, N.Y.
       February 19, 2008

Respectfully submitted,

_____
Robert B. Blackburn (RB 1545)
Local Counsel

Securities and Exchange Commission
3 World Financial Center
Room 4300
New York, N.Y. 10281-1022
(212) 336-1050
(212) 336-1317 (Fax)

_____
James A. Kidney (JK-5830)
Scott W. Friestad
David Frohlich
Stephen E. Jones
Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
(202) 551-4441 (Kidney)
(202) 772-9246 (Kidney fax)